Cecil LEATHERS and Julia Leathers,
his wife, Appellees,

v.

GENERAL MOTORS CORPORATION,
Appellant.

No. 74–1392.

United States Court of Appeals,
Fourth Circuit.

Submitted Oct. 9, 1975.

Decided June 14, 1976.

Jeremiah C. Collins, Washington, D. C. (Allan A. Ryan, Jr., Washington, D. C., on brief), for appellant.

Edgar B. May, Washington, D. C. (Howard B. Silberberg, Arlington, Va., on brief), for appellees.

Before RUSSELL and WIDENER, Circuit Judges, and WATKINS, Senior District Judge.*

WATKINS, Senior District Judge:

On May 9, 1972 the employer of the Plaintiff, Cecil Leathers, purchased a new Chevrolet Kingswood station wagon from an authorized General Motors dealer, and gave custody of it to Leathers to use in personal and business activities. On July 23, 1972, after the car had been driven about 2,000 miles without any difficulties, Leathers was involved in a serious accident. According to his testimony, which is not disputed, he was driving with his wife as a passenger on West Ox Road, Fairfax, Virginia, when he swerved sharply to the left, to avoid a dog. He further testified that at that time the steering gear locked; he could not turn to the right and the car went straight across the road and hit a tree.

That the vehicle in question was manufactured with an inherent steering defect is clear. Whether that defect was the proxi-

* United States District Judge for the District of Maryland, sitting by designation.

mate cause of the accident is in dispute. The appeal also raises a serious question arising from the argument to the jury of Plaintiffs' counsel.

Knowledge by Defendant of the defect is clearly established by three letters by Defendant to Office of Defects Investigation, National Highway Traffic Administration, Department of Transportation, and by a quotation from General Motors Dealer Service Technical Bulletin. These read as follows:

The probability and total configuration required to permit a steering system problem to occur has been described above. When these cars are driven on extremely wavy, rutted, or chuckhole filled roads in a manner which causes the car to pitch excessively, the frame crossmember occasionally may scoop up loose stones. These stones may be thrown up into the frame area adjacent to the steering coupling, and, while they will generally fall away, the possibility exists that a certain size stone, entering this area under just the right circumstances, might interfere with steering effort. A malfunction may only occur if a certain size and shape stone becomes wedged while the steering wheel is being turned left, and additional effort will often purge the stone through. Turning the steering wheel right will usually discharge the stone and return the steering system to normal operation. (May 2, 1972; App. 14)

\*  \*  \*  \*  \*  \*

. . . In at least two cases . . the owners allege that interference occurred while they were attempting to steer to the right. All of our testing indicates that if a stone should become wedged between the flexible coupling and frame, it can only interfere with steering when the driver attempts to turn to the left not to the right. Turning the steering wheel to the right will dislodge a stone rather than interfere with the steering . . . (November 21, 1972; App. 26)

\*  \*  \*  \*  \*  \*

When these cars are driven on unpaved road surfaces particularly roads which are heavily graveled and which are extremely wavy, rutted or filled with chuck holes, at speeds which cause the car to pitch excessively, the front crossmember may scoop-up loose stones or gravel from the roadway. These stones may be thrown up into the engine compartment. The possibility exists that one of these stones may lodge between the steering coupling and the frame and cause increased steering effort or interference with steering control of the car when the steering wheel is turned to the left. (January 19, 1973; App. 26)

When these cars are driven on extremely wavy, rutted or chuck-hole filled roads in a manner which causes the car to pitch excessively, the frame crossmember occasionally may scoop up loose stones. These stones may be thrown up into the frame area adjacent to the steering coupling and, while they will generally fall away, the possibility exists that a certain size stone entering this area under just the right circumstances might interfere with steering coupling rotation and result in increased steering effort. (May 19, 1972; App. 17)

The letter of May 2, 1972 refers to the malfunction occurring only in a left turn but it claims only that a left turn "will often purge" the foreign object; and that turning the steering wheel right "will usually discharge the stone and return the steering system to normal operation."

The letter of November 21, 1972 claimed that interference could only occur "when the driver attempts to turn to the left not to the right" but it is silent as to how this interference can be overcome. The letter of January 19, 1973 is to the same effect.

The Dealer Service Technical Bulletin of May 19, 1972, contains no limitation to left turn origin, and does not negative the possibility that foreign matter may interfere with steering in either direction.

In its statement of proposed evidence, Defendant stated that it proposed to call

one of its employees as an expert witness. This was not done, although apparently he was present in court.

Plaintiffs' expert did not appear in court in time for the trial.

The male plaintiff's testimony about an experiment in which plaintiffs' expert "shoved" "some stones and things like that" down into the steering mechanism of a car like the one plaintiff was driving was inconclusive as to the effect on steering.

Finally, the investigating officer testified that the male plaintiff was interviewed immediately after the accident. The response to the question as to what plaintiff had said about how the accident happened was ". . . he related to me that there had been an animal, a dog, that crossed the road in front of his path and he had to swerve to the left to avoid striking him." (App. 118). Note that there is no reference to any steering problem.

The road on which plaintiff was driving was eighteen feet wide; a typical secondary road, with low shoulder, quite curvy, a bumpy-type road with potholes that had been filled. On the road was a county sanitation dump, and the trucks using it often dropped debris.

Just before getting on West Ox Road, plaintiff had parked at two locations at each of which the parking area was partly black top and partly gravel.

It is clear that the car had been in areas where the physical condition of the road fell within the areas of danger described by General Motors. The parking lots and the road had loose gravel. The road was wavy, and filled with chuckholes. However, there was no testimony that the operation of the vehicle met the other prescribed conditions. It was operated within the posted twenty-five mile an hour limit. There was no testimony that it pitched, or that the front crossmember scooped up anything.

Defendant, having unsuccessfully moved for dismissal at the end of plaintiffs' case, again moved for dismissal at the end of the whole case, both for lack of primary negligence and lack of proximate causation.

The motion was denied, although the court recognized that "[I]t is thin . . . to get to the jury on the question of proximate cause, particularly . . ." (App. 121). We agree with that appraisal, but are unable to find that it was such an abuse of discretion or such an exceptional circumstance as to justify a reversal on this ground alone. *Aetna Casualty and Surety Co. v. Yeatts,* 122 F.2d 350, 354 (4 Cir. 1941); *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946). The cases principally relied upon by Defendant do not lead to a different result. In *Ford Motor Company v. McDavid,* 259 F.2d 261, 266 (4 Cir. 1958) the excessive and abnormal tire wear could have been produced by any of a number of possible causes, with most of which the Defendant could have had no possible connection. *Smith v. General Motors Corporation,* 227 F.2d 210, 213–214 (5 Cir. 1955) involved far less probability than this case. *General Motors Corporation v. Wolverine Insurance Co.,* 255 F.2d 8, 9 (6 Cir. 1958) was a case in which ". . . the inference of negligence clearly 'stands equiponderant at best' with the contrary inferences relied upon by the defendant. It was, therefore, the duty of the district court to direct a verdict in favor of the defendant."

In his opening argument, Plaintiffs' counsel stated:

Mr. Leathers is going to live those 26.9 years disabled. We submit the disability was caused by the steering defect in a General Motors car.

I don't know, again, how to put a number on that. It's the loss of the use of your legs, to some extent, the loss of doing sports or hobbies which are athletic, the general limitation in your job duties, general limitation in your enjoyment of life, pain, further medical treatment over a period of 26.9 years. 26.9 years are a lot of years, somewhere close to 9,000 days. *I don't know how much you—how much you put a dollar value on it, but how much dollars would it be worth to you, $30 a day, $20, $300 a month?* The only way he can be compensated is with mon-

ey. He can't be compensated with a new leg or having his leg put back in good condition, and I ask that you consider that. (Emphasis added.) (App. 124)

Immediately upon conclusion of the opening argument, counsel for Defendant vigorously objected to the above-quoted remarks. The Court's response was:

I will admonish the jury to disregard it, if you want. *It will make more of it than has already been made.* I can tell them that is not what the evidence shows. (Emphasis added.) (App. 126)

Counsel for Defendant then twice asked for a mistrial, rather than have the Court "prove it up" which motion was denied.

After the verdict was recorded, Defendant renewed its motion for a directed verdict for lack of proof of negligence and causation. Although recognizing that it "is not the strongest case I have ever seen for the Plaintiff" the Court denied the motion. (App. 132)

Defendant then moved for judgment N.O.V. which was denied, and for a new trial on the basis of a "thin case" coupled with the Golden Rule argument of Plaintiffs' counsel, which motion was also denied.

Having found that submission of the case to the jury was not an abuse of discretion or an exceptional circumstance, we likewise conclude that the failure to grant a directed verdict at the end of the evidence or judgment N.O.V. after verdict was not in and of itself reversible error insofar as solely questions of negligence or proximate causation are concerned.

■ While we have no hesitation in condemning the argument of plaintiffs' counsel hereinabove quoted, we do not agree with the contention of Defendant's counsel that invoking the Golden Rule is, standing alone, necessarily reversible error; and the two Virginia cases cited do not go that far.

In *Norfolk & Western Railway Co. v. Keatley,* 211 Va. 507, 178 S.E.2d 516 (1971) plaintiff's counsel invited the jury to ask themselves "how much they would pay a doctor to relieve themselves from pain for one hour." While recognizing the impro-

priety of this argument, the Virginia Supreme Court refused to reverse a verdict for plaintiff where the defendant had neither requested a curative instruction nor moved for a mistrial.

In *Seymour v. Richardson,* 194 Va. 709, 75 S.E.2d 72 (1953) the classical Golden Rule argument was made that the jury should so do unto the plaintiff as they would wish it to be done to them. (75 S.E.2d at 81). Plaintiff's counsel objected, but it does not appear whether he moved for a mistrial or for a curative instruction. Although noting that plaintiff's argument "was improper and should not be repeated" (75 S.E.2d at 81) the Virginia Supreme Court held that improper damages had been allowed, and remanded for a new trial on the question of damages only.

■ While not as extreme an argument as in *Klotz v. Sears, Roebuck & Co.,* 267 F.2d 53 (7 Cir. 1959) or as egregious as in *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276 (5 Cir. 1975), in both of which the arguments were held to be reversible error, the argument in this "thin" case was serious error. Counsel for defendant was placed in an unnecessarily difficult and embarrassing position. To interrupt argument by plaintiffs' counsel might antagonize the jury, and would certainly emphasize the point. Both defendant's counsel and the court felt that a curative instruction would point up the argument and would "make more of it than has already been made."

Under the circumstances we conclude that Defendant's motion for a new trial should have been granted, and we so direct.

*REVERSED AND REMANDED FOR A NEW TRIAL.*

WIDENER, Circuit Judge (concurring and dissenting):

I concur with that portion of the court's opinion affirming the district court's denial of General Motors' motion for directed verdict; however, I respectfully dissent from that portion which reverses because of improper argument to the jury.

During closing argument, Leathers' attorney stated:

"I don't know, again, how to put a number on that. It's the loss of the use of your legs, to some extent, the loss of doing sports or hobbies which are athletic, the general limitation in your enjoyment of life, pain, further medical treatment over a period of 26.9 years. 26.9 years are a lot of years, somewhere close to 9,000 days.

"I don't know how much you—how you put a dollar value on it, but how much dollars would it be worth to you, $30 a day, $20, $300 a month? The only way he can be compensated is with money. He can't be compensated with a new leg or having his leg put back in good condition, and I ask you to consider that."

The attorney for the defendant did not object when the argument was made, but approached the bench and objected at the close of the argument.

The district court offered to admonish the jury to disregard the comment as improper argument, but pointed out that such an instruction could "make more of it than has already been made." General Motors rejected the court's offer to admonish, but rather moved for a mistrial, which motion was denied.

At the beginning of General Motors' closing argument, its attorney stated:

"I am asking—or all we are asking on both sides is that you bring to this the same type consideration that you would bring—*you would want to have people bring to your trial.*" (Italics added.)

While the argument by Leathers' counsel is at least arguably a use of the word "you" in an impersonal sense, which of course is not error, General Motors' argument is clearly an improper use of the word. I am of opinion that, regardless of the propriety of the initial remark made by Leathers' attorney, General Motors cannot claim to have been prejudiced by Leathers' allegedly improper statement since its attorney reaffirmed Leathers' argument to the jury by stating "we are asking on both sides" that the same rule be invoked, and General Mo-

tors use of the word "you" was clearly not an impersonal one.

In my opinion, General Motors has waived any objection to Leathers' argument for three separate reasons. First, as previously discussed, it adopted the argument; second, it made no contemporaneous objection; third, it refused the offer of the court to admonish the jury.

No case has been found in Virginia which has reversed for such argument. *See, e. g., Norfolk & Western R. R. Co. v. Keatley,* 211 Va. 507, 178 S.E.2d 516 (1971); *State Farm Ins. Co. v. Futrell,* 209 Va. 266, 163 S.E.2d 181 (1968); *Phillips v. Fulghum,* 203 Va. 543, 125 S.E.2d 835 (1962); *Cape Charles Flying Service v. Nottingham, 187 Va. 444, 47 S.E.2d 540 (1948);* Seymour v. Richardson, 194 Va. 709, 75 S.E.2d 77 (1953); *Crosswhite v. Barnes,* 139 Va. 471, 124 S.E.2d 242 (1924); and *Lorillard Co. v. Clay,* 127 Va. 734, 104 S.E. 384 (1920) (none of which reversed for like argument.)

Since the judge offered to instruct the jury to correct the argument, we must consider that as having been done. I find only one federal case which has reversed when such instructions were given. *Klotz v. Sears, Roebuck & Co.,* 267 F.2d 53 (7th Cir.) cert. denied 361 U.S. 877, 80 S.Ct. 141, 4 L.Ed.2d 114 (1959). In *Klotz,* the plaintiff was awarded substantial damages for the loss of his left eye. Plaintiff's attorney, in closing argument, at least twice entreated the jurors to "do unto others as you would have them do unto you" and on several occasions challenged the defendant's attorney to say how much money he would take for one of his eyes. Plaintiff's attorney also referred to the price of an eye in a buy-sell arrangement, indicating that defendant had bought plaintiff's eye and the jury was to determine the selling price. At the close of the argument, plaintiff's attorney again invoked the golden rule. Some of these remarks were objected to and the trial court instructed the jury to disregard them. In reversing, the Seventh Circuit stated, "[t]he nature of the remarks, their number and repetition, when considered in connection with the record as a whole, evi-

dences a deliberate appeal to the jury to substitute sympathy for judgment . . ." 267 F.2d 55.

As previously noted, the remark of Leathers' counsel in closing argument is susceptible of the interpretation that it was a proper use of the word "you" in an impersonal sense. That aside, the remark was made only once and it does not seem to me to be "a deliberate appeal to the jury to substitute sympathy for judgment." In my opinion the argument in the setting of this case was not reversible error. *Accord*, e. g., *Shroyer v. Kaufmann*, 426 F.2d 1032 (7th Cir. 1970); *Har-pen Truck Lines, Inc. v. Mills*, 378 F.2d 705 (5th Cir. 1967); *Roy v. Employers Mutual Casualty Co.*, 368 F.2d 902 (5th Cir. 1966).